James Saccheri, Honorable Justices, on my own behalf, and I would like to reserve the last three minutes for rebuttal if possible. My main point is that I believe both the bankruptcy appellate panel and the trial court clearly erred in not determining that Mr. Montgomery knew what he was signing when he signed the loan documents for the $350,000 loan from Yankee Farm Credit. Now, Mr. Saccheri, you were a licensed attorney for many years. Yes, yes. And you're no longer licensed, am I right? No, no. And Mr. Montgomery was a close friend of yours, was he not? He was not a close friend, but he was a relative. He was a relative of my wife. He was a second cousin to my wife. Okay, so he's a relative. Yes. But you had been his attorney for many years. I had been his attorney for off and on, on some cases, for maybe 10 years. Okay. And you gave him these things to sign. I did not give him all of the documents. Well, how did he get them? Well, the documents that I've attached at tab K, L, M, and N. M and N, for example, M was a document which was the guarantee that Mr. Montgomery signed. It was a full unconditional guarantee of the $350,000 loan. That document came directly from the attorney for Yankee Farm Credit, who was based in Plattsburgh, New York. She sent him that document. I don't understand the relevance of the whole Montgomery loan thing. It seems to me the whole question about the loan, if we just back that out, there is a whole other set of problems with regard to the money that you took and basically put into the accounting records as Northwest Fund or something, in which you have no claim that anybody else knew what was going on there, as I understand it. Well, you can go on about that, but it's separate from the Montgomery thing. And all of the funds that were disallowed as to discharge was that money, right? None of it was the loan. That's correct. So what's the relevance of the Montgomery thing? I always just forget about it. Because the relevance of the loan was that how the transaction transpired was that because of the loan. But what does it have to do with the judgment? Nothing. Well, I believe it does. Why? Because the — because if Mr. Montgomery knows, which he did, if Mr. Montgomery as a director and as secretary of treasury of the corporation knows that the loan exists, then he knows that the financial statements are incorrect. As to that? Not only as to that. But he doesn't know you're taking money. He doesn't know that you're pocketing money. Well, yes, because if you look at the financial statements, they don't balance without him understanding that I have assumed responsibility for that loan and in exchange the corporation has agreed to allow me to draw extra funds until I pay that loan off. Is the second part anywhere in anything he signed? No. But it was — that's why he signed the loan. How do we know? Is there any evidence of that? Well, my testimony, but my point is, is that once you acknowledge that Mr. Montgomery knows that the $350,000, as director, knows that that loan exists, then you immediately go to the first financial statement, which is in tab P, the September 30th, 2004 statement, which has the North Country Trust funds on the financial statement, does not have the line of — As an asset. As an asset. Which it wouldn't be if it was a loan. Okay. Well, it would be an asset for the corporation. It would be a debit to me, but it's an asset for the corporation. No, but the loan was supposedly a loan to the corporation. Okay. So it would be a debt, not an asset. Well, for the $350,000 loan. That's correct. I'm sorry. I misunderstood, Your Honor. I thought you were talking about the North Country account. No. So the North Country then, which shows up as an asset, couldn't have been that loan. So I don't understand what it has to do with anything. Well, what that financial statement shows is that there is no long-term liability. And yet Mr. Montgomery knows that there is a long-term liability. Okay. Fine. How does that let him know that you're taking money and calling it a Northwest Trust fund? Well, because my contention is, is the statute of limitations, first of all, starts to run from that point, from September 30th, 2004, because they should have known something was wrong. That's clear from the record. Something, but not that thing. No. The trust line was in there as well. And the absence of the loan, you know that then the financial, unless the other directors had agreed, unless the other directors had agreed to what was being done. They're all supposed to know somehow that you're taking money out of the corporation. He did. What? I'm sorry. I just said they did. Well, what evidence do you have that they did? And when? When did they know? They knew as of, they knew as of June 30th of 2004. Because? And for certain by, and they knew on. The finding is that they didn't. Right? Well, the, and I'm saying that that's, that finding is unreasonable in light of the fact that Mr. Montgomery knew that that $350,000, excuse me, loan existed. But the bankruptcy judge is the finder of fact and the determiner of credibility. Right. And the bankruptcy judge heard your testimony, and you'll forgive me, heard Mr. Montgomery's testimony, believed Mr. Montgomery, didn't believe you, found him to be credible and you to utterly lack credibility. Well, I understand that. And so what are we supposed to do here? We're supposed to re-find that fact? Well. In your favor? I assume that, yes, that's what I'm asking you to do, because I think the original finding, I mean, the Court even, even mentions, I mean, the trial court in its opinion mentions that Mr. Montgomery may have committed perjury by signing these documents and yet states that he's, that he's credible and states that it's believable that he doesn't know about the $350,000 loan. I mean, I only put four of the many documents that were signed as attachments here. And the main reason I did that was because I wanted to, I wanted to try to focus on what I think is a very unreasonable conclusion by the, by the trial court. The very first document was a loan request worksheet. It was just a one-page document. Bold type, from Yankee Farm Credit, bold type, loan request, and yet Mr. Montgomery can sign that document and not, not know what it was? The resolution, the justice. But how was it presented to him? Just, did you just say here, sign this? That document I just delivered. Was it the only document presented to him? It was the only document. That was the only document presented to him. That was early on in the loan process. It was in March. The loan closed on June 30th. That was the, the one document that triggered the process. It was a one-page document. It wasn't. Did you raise the statute of limitations before the bankruptcy judge? Yes, I did. I mean, the, the, I had it in my complaint. They have to understand, at the, at the trial, the bankruptcy judge made the argument before the case or at the conclusion. When testimony concluded, he, he, he did not want oral argument. Instead, what he asked is that each counsel prepare findings of fact and submit those findings of fact. Well, that's not uncommon. I understand that. You were an attorney. You know that. I know that. But it was then at that, at that point when my findings of fact were submitted that because I had raised the statute of limitations in the answer to the complaint, I argued it in the, argued it in, in the fact that I presented findings that would show that the statute of limitations applied to this case. He, he obviously rejected most of, most all of my findings and instead adopted practically word for word the findings of the counsel for the dairy. And so that's why there's not the only thing that the bankruptcy appellate panel found in the record, and they refer to it as the only reference to the statute of limitations was in the answer to the third amended complaint. But yes, I mean, my answer is yes. I believe I raised the statute and I believe it was raised timely and, and it. Then you go to the, let's, let's assume then that the, I'm not conceding that that's what the record states, but let's assume for a moment that that is the case that the statute of limitations was properly before the judge. The judge then found, and it's a question of fact under the law of this circuit. Right. And the judge then found that the statute of limitations was properly before the judge when people knew or should have known. Right. And again, you disagree with that. And again, I disagree with that. And it goes to what I feel is just a totally unreasonable, illogical, implausible I don't know what term you would use with it, but to look at, for example, M&N, the two documents that I, two documents that I did not give to Mr. Montgomery, two documents that came from the attorney for Yankee Farm Credit on June 29th and June 30th, the time frame when the loan closed. She sends him the guarantee. I don't give him the guarantee. She sends it across the country. He signs it in front of a notary and right above his signature, immediately above his signature. I have an addition to my earlier questions. Okay. Let's assume Mr. Montgomery knew. What does that prove about the board of directors and the corporation? Well, he was a member of the board of directors and secretary treasurer. He was a member, but there were other members. They knew. And the loan never went to a vote of the board of directors qua board of directors of the company. Yes, it did. It did? That's what is reflected in the certificate of resolution that Mr. Montgomery signed and initialed. But the COSERA said it never did. Well, I know that's what they claimed. And the bankruptcy judge believed them. I understand. And made a finding to that effect. I understand that. Okay. So maybe Mr. Montgomery was in cahoots, but how does that help? Well, he wasn't in cahoots with me. Well, you're essentially saying he was. I mean, that he knew all this. Well, he knew all this, as did all the directors. But you have no evidence that the others knew and the district and the bankruptcy judge found they did know. No. My best evidence was Mr. Montgomery because he signed that and because he signed those documents. So your argument basically is that everybody knew you were, in essence, embezzling all this money, and they just went along with it? I was not. I mean, that was not what I was doing. I was the one party that spent half my time for five years in New York. And they understood. You were compensating yourself for your time? And everybody knew about it? And they knew about it. That's what my testimony was, and that would be my testimony today. And it became to their advantage to have me out. I can understand the possibility that despite the bankruptcy judge findings, we might be able to look at these pieces of paper that Montgomery signed and say, how could he not know about it? Right. But I don't see how that gets you. But as to the rest of it, there are findings of fact as to which the only contrary evidence is yours, verbal testimony, no documents. And the bankruptcy judge found it against you. And that's and all, I mean, am I correct in saying that all of the disallowed funds trace to the purported embezzlement, whether you think it was embezzlement or not, not to the loan. And so as long as that part is supported by — is not clear error, that's it. We go home. Well, no, because in addition to the — in addition to the — to my argument with regard to the statute of limitations and the argument with regard to justifiable reliance, I do also argue that even if the court were to affirm the judgment, that it should be reduced by those amounts that were actually paid to the corporation. I mean, the court — the judge, for example, just to take the three biggest items, the $50,000, the judge in his opinion recognized the fact that that money was paid by me for the $50,000 worth of stock and that the corporation received $50,000. That should have been credited against the judgment. Instead, he says, well, go sue Mr. Montgomery. Why not just credit it here? And the same thing with the dividends. The dividends, all the money that was — that I received was there in checks, and those checks were listed. Then suddenly they introduced my tax returns, which show I paid taxes on what I believed at the time were legitimate dividends that came from those cash checks. And those dividends are just added on top of it, so it becomes a double charge. They didn't do that. I reported my management fees. I reported it all on my tax returns. They didn't double everything, but it did double what amounted to doubling the dividends. Roberts. Okay. Why don't you have a seat? I'm sorry. No, that's okay. We understand. We'll hear from the other side now. Good afternoon, Your Honors. My name is John Jackson Waste. I represent the Appelli St. Lawrence Valley Dairy. This is not a legally complex case. This is an instance of Section 523 of the Bankruptcy Code functioning precisely as Congress intended that it do. The Bankruptcy Code's purpose is to afford the proverbial honest but unfortunate debtor a fresh start. Section 523 makes sure that that is not used to shield those who commit fraud from the obligation to make recompense to their victims. The gravamen of the appellant's argument is that his fraud scheme was quite literally so transparent that it should have been discovered years before it was. Leaving aside the very real possibility that the appellant should be equitably estopped from even raising that argument, the legal consequence which he argues follows that the claims are time-barred is invalid for a number of reasons, many of which have already been discussed by this Court. First of all, the trial court found quite explicitly that Mr. Montgomery's testimony was entirely credible and the appellant's was entirely lacking in credibility. As the Court is well aware, express findings of a witness's credibility made by a trial judge who has personally reviewed that witness and personally. Ginsburg. Let me go back to the Montgomery thing. Does the whole loan incident matter at all to the ultimate, to the ultimate? I would submit that it does not, Your Honor. I, I, I. And, and, and. Could it apply to the statute of limitations? Have some relevance to the statute of limitations? If there could be a showing of profoundly clear error in Mr. Montgomery's testimony, which I would submit that there has not been, and it was determined that he became aware of the loan at a time prior to when he did. Well, then that would back out the loan, but what about the rest of it? There's a number of, there were a number of other fraudulent instances and takings. Additionally. And all of the, of the money that was disallowed was traceable to the embezzlement, none of it to the loan. Correct. Additionally, there's the fact that a substantial portion of the obligation that was ultimately determined non-dischargeable was an obligation that resulted from the appellant's breach of a settlement agreement that was initially reached shortly before his bankruptcy, whereby he agreed to pay back the loan. That agreement was reached and subsequently breached in approximately June of 2008, shortly before the bankruptcy and well within the statute of limitations. To pay back the loan or pay back the money he took out? To pay back the money he took out, some of which I believe was tied to interest payments on the loan. I see. So in essence, I don't think that the date at which Michael Montgomery became aware. Because I must say I do have some problems with the notion that somebody could sign those pieces of paper, which I looked at, and not know what they were. I'll admit, Your Honor, that it seems as though that's a bad practice to sign papers without. And there's a fair amount. I guess this is Federal law. I know there's a fair amount of California law about when that kind of defense is viable, and occasionally it is, but it seems at least questionable. And if we don't need to deal with that, and you're saying we don't. And BAP said that, too. That is correct. That's been uniformly held. And I can't speak for Mr. Montgomery. I can only say that the trial court heard his testimony and found it credible and that I do think if we consider it in the general sort of factual nexus in which this case arose, which is that he did have, although it's now being strategically downplayed, a very longstanding and deep trusting relationship. You still have to be fairly blind. I mean, they'd have to be not only frustrated, but it's not like this was a complicated legal document. It's sort of right on top of what it was. I can't say necessarily what his thought process was at the time those documents were and weren't signed. All I can say is that the trial judge observed that testimony and was able to look at not only what was being said, but how it was being said, and consider that in context with the rest of the case and make his determination of credibility on that factual point. And that I don't think that, although it may seem like a practice that you or I would certainly not employ in signing a document, I don't know that there's any evidence to overturn that finding of credibility. So there was another, I guess, account or whatever, the North, what was it, the North Trust? North County Trust or North Country Trust. It starts at a very low amount, but over time it increases significantly. Correct? Correct. Did anybody ask, what's this all about? So initially when that asking was done was in 2007 when the Board of Directors of the Dairy discovered that things were very profoundly amiss. They had a CPA come in and do an external audit, at which point the entire House of Cards was discovered at that time. But before then, there was nothing that suggested that they ought to inquire? I mean, a reasonable person, a member of the Board, wouldn't want to inquire? I think that one could certainly make that argument, Your Honor, but that as the facts were, the other three Board members were relatively unsophisticated investors. They were in Fresno, California. This was an investment that they made at the urging of their friend and attorney, and they considered it something of a passive investment. I think that their management of the corporation was, there was not perhaps as much day-to-day oversight as one might expect. This isn't the Board of General Motors. These are individuals that are in disparate locations relying on their lawyer. That's correct, Your Honor. At this juncture, the statute of limitations does not bar this claim, and I would simply submit that I don't think we've had any showing that any of the trial courts have actual findings. Did the bankruptcy court actually deal with the statute of limitations? The argument wasn't raised at the bankruptcy court at all. He raised it in his trial brief that he submitted to the bankruptcy court. My understanding is that it was raised in his answer, but essentially not. It was raised in his trial brief, too. Right at the very end of the trial brief, he raises it. I was not involved in the trial court litigation. I can only say that from my review of the record, it was certainly not dealt with extensively. I know the BAP addressed the point of the statute of limitations in its decision and came to a fairly clear conclusion that that was not. Usually when you're dealing with inquiry notices, you use an objective standard. Would a reasonable person in all these circumstances be on inquiry notice? And in this case It's a little bit different than justifiable reliance. Sure. I think in this case the court looked at the evidence and decided that they, for whatever reason, they weren't aware and that due to the relationship with the appellant that this lack of awareness was determined reasonable at that time. I think the BAP discussed the fiduciary context of the relationship. Exactly. There was a very high degree of trust and the appellant was acting in a fiduciary capacity with respect to the appellees and their roles as members of the board of directors. He was a board member, too, though, correct? Wasn't he? That's correct. So there were four board members. It was Michael Montgomery, the Cazares, and the appellant. So if the court doesn't have any further questions or issues that you'd like to address, we'll move on. I don't. I will submit. No, I don't. Thank you. You have a minute. Just that the — I didn't get to address the $50,000 loan. The $50,000 payment that I made back to the corporation, well, for the benefit of the corporation by purchasing the shares for Mr. Montgomery, the court said that plaintiff did not owe the money to Dr. Lee, but, in fact, the dairy did owe the money to Dr. Lee, and then I paid it for the dairy because the dairy had received the money from Mr. Montgomery. The same with the $19,265 that was paid. It was owed to me. I asked that the obligor pay it directly to the dairy. The trial judge acknowledged that. That's credit I should have received. And Mr. Weiss mentioned the $375,000 settlement that was signed at one time. The fact is, as the Court can see, with the proper credits, if there is a judgment at the end of this, it should be $356,000, not $492,000. Okay. Thank you. The matter is submitted, and that ends our session for today.
judges: Paez, Berzon, Ezra